UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEUROLOGICAL SURGERY PRACTICE OF
LONG ISLAND, PLLC,

                   Plaintiff,

  -against-

EMPIRE HEALTHCHOICE HMO, INC. and
EMPIRE HEALTHCHOICE ASSURANCE, INC.,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. 21- cv - 2204

      Plaintiff, Neurological Surgery Practice of Long Island, PLLC ("Neurological Surgery"), by its attorneys, Harris Beach, PLLC, alleges for its Complaint against Defendants, Empire Healthchoice HMO, Inc. and Empire Healthchoice Assurance, Inc. ("Empire"), as follows:

## INTRODUCTION

      1.     The world universally regards the American health care system as the finest in the world. Traditionally, the cornerstone of this system has been freestanding physician practices. These practices comprised of a single or a small number of physicians who practice the same medical specialty, have historically provided innovative, high-quality medical care to patients.

      2.     The secret to the success of these practices is freedom. The physicians themselves own these practices, and thus are free to decide all aspects of how to deliver their services to patients. Given the relatively small size of these practices, their physician-owners have developed longstanding, personal relationships with patients, which enhance both the quality of patient care and the overall patient experience.

3. Additionally, because these practices have traditionally been independent of any hospital, referring provider, or health plan, they have been able to recommend the best course of medical treatment for their patients free of any outside influence or conflict of interest.

4. They are also small enough to innovate nimbly. In summary, these small, freestanding, single specialty medical practices are the very essence of American capitalism.

5. As we explain in detail below, Neurological Surgery is a prime example of this small, freestanding, single specialty medical practice. Founded over three decades ago, it has focused on providing high quality neurosurgery care to patients throughout the New York metropolitan area. Owned by its physician providers, it traditionally has been independent of any hospital or health plan. Through hard work providing excellent care, Neurological Surgery has become the most innovative, high quality neurosurgery providers in the metropolitan area.

6. Unfortunately for Neurological Surgery and other freestanding surgery practices in the New York metropolitan area, Empire – one of the largest managed care organizations and health plans in the area– has embarked on a campaign of illegal and anti-competitive actions that directly target these practices, and are designed to strangle and, ultimately, force these freestanding neurosurgical practices out of business.

7. The means that Empire has employed to carry out their illegal and anti-competitive scheme is their knowing and intentional dramatic lowering of reimbursement rates to levels that are far below the costs of these practices to provide services. Putting it starkly, Empire is imposing shockingly low reimbursement rates on neurosurgery practices, including Neurological Surgery that they know are fake and manipulated.

8. Empire's illegal and anti-competitive actions have already significantly harmed Neurological Surgery and other freestanding neurological surgery practices in the New York

metropolitan area. If allowed to continue unchecked, Empire's actions will cause a substantial and unreasonable harm to competition in the metropolitan area. This will result in decreased output and quality of neurosurgery and other surgical services, higher prices, longer wait times, and loss of consumer choice. As we explain in detail below, this is precisely Empire's desired result, because the driving out of freestanding neurosurgery practices enables them to reap anti-competitive benefits through the use of these fake and manipulated reimbursement rates.

9. As we also explain in detail below, nothing more than greed motivates Empire's actions. While Empire is drastically cutting its reimbursement rates to neurosurgery (and other freestanding medical specialty practices), it is certainly not passing these "savings" on to its customers. Upon information and belief, for 2021, Empire has demanded premium increases from its commercial customers in excess of 15%. It sought average premium increases from the New York State Department of Financial Services for its individual and small group plans of more than 16% in 2021 (although the State granted far smaller increases),

10. During this same period, Empire's revenues and profits have dramatically increased. In January 2021, Empire's parent, Anthem, Inc., reported operating revenue of $31.5 billion in the fourth quarter of 2020, an increase of $4.4 billion, or 16.2 percent, from the fourth quarter 2019. Its benefit expense ratio was 88.9% in fourth quarter 2020, a decrease of 10 basis points from fourth quarter 2019. Operating cash flow was $3.8 billion in fourth quarter 2020, an increase of $2.5 billion over fourth quarter 2019.[1]

11. As Empire is fully aware of, its dramatic lowering of reimbursement rates is forcing many freestanding neurosurgical practices to leave the market. As we explain in detail

---

[1] https://www.businesswire.com/news/home/20210127005298/en/Anthem-Reports-Fourth-Quarter-and-Full-Year-2020-Results (accessed Apr. 7, 2021).

3

below, this is causing significant harm to patients through the decreased availability of neurosurgical services, and reduced quality.

12. While Empire is dramatically lowering neurosurgery reimbursement rates across the board, it is well aware that the freestanding neurosurgery practices are withstanding the worst of this decrease. This is because hospital-based neurosurgery groups are largely immune to decreased reimbursement rates because of the hospitals' other revenue sources.

13. Indeed, as discussed in detail below, for every $1 in direct reimbursement that hospitals receive from providing neurosurgery services, the hospitals receive $14 in additional ancillary revenue generated from those neurosurgery services. Thus, as Empire is well aware, the hospitals can tolerate – and even accept – an artificial lowering of this $1 in direct neurosurgery reimbursement to as low as 10¢, as long as the $14 in ancillary reimbursement is preserved.

14. The hospitals can use this $14 to help defray the high costs of providing neurosurgery services; while the freestanding practices such as Neurological Surgery are forced, pay these ever-increasing costs out of the 10¢ of direct reimbursement.

15. As a result, Neurological Surgery and other freestanding practices are falling further and further behind financially because of the dramatically declining reimbursement rates, which no longer even remotely reflect the high costs of providing neurosurgery care. Empire is well aware of this fact and, indeed, intends for it to occur so that it can drive the freestanding neurosurgery practices out of business.

16. The departure of freestanding neurosurgical (and other surgical) practices from the market is also decreasing competition among Empire and other major managed care companies in the New York market. This is because freestanding surgical practices fiercely

4

advocate for their patients, educate their patients about improper insurance practices, and expose the fact that many health plans currently offer illusory benefits and minimal coverage in many cases.

17.     When freestanding practices education patients practices in these ways, the patients put pressure on the health plans to innovate, improve their offerings, and change their ways. This significantly promotes competition among health plans in the market for purchasing health plan benefits. Elimination of freestanding surgical practice will grind this competition to a halt, and thus greatly harm the individual and corporate purchasers of health plan benefits.

18.     As set forth in greater detail below, Empire's actions – particularly the systematic lowering of reimbursement rates for neurosurgery services, resulting in utterly fake and manipulated rates — has unreasonably restrained and damaged competition in the market for these services in violation of Section 1 of the Sherman Act., 15 U.S.C. § 1, and the New York State Donnelly Act, General Business Law §§ 340, *et seq.*

19.     Through this lawsuit, Neurological Surgery seeks a declaration that Empire's actions in imposing these fake and manipulated reimbursement rates are illegal, a permanent injunction preventing Empire from continuing these anti-competitive practices, and compensatory damages for the financial harm Neurological Surgery has suffered because of Empire's anticompetitive actions.  Neurological Surgery also seeks an award of attorneys' fees and such other and further relief as the Court may deem just and proper.

## PARTIES

**Plaintiff**

20.     Neurological Surgery Practice of Long Island, PLLC is a New York professional service limited liability corporation with its principal place of business located at 100 Merrick Road, Suite 128W, Rockville Centre, New York.

21. Neurological Surgery Practice of Long Island, PLLC was formed in August 2020, and, because of a merger in December 2020, is the corporate successor of Neurological Surgery, P.C.

22. Neurological Surgery is the most prominent private neurosurgery practice in the New York metropolitan area. Its award-winning specialists are among the best neurosurgeons in the region.

23. Neurological Surgery has developed Centers of Excellence in a wide variety of neurosurgery and related subspecialties, including a Brain Tumor Center, Spine Center, Trigeminal Neuralgia and Face Pain Center, Cerebrovascular/Neuroendovascular Center, Pediatric Neurosurgery Center, General Neurosurgery Center, Movement Disorder Center, Epilepsy Center, Concussion Center, Stereotactic Radiosurgery Center, Chiari Malformation Center, and Pain Center.

24. Many of the patients treated by Neurological Surgery have complex neurological conditions requiring neurosurgical procedures and treatment.

25. Neurological Surgery's physicians perform these procedures at hospitals and other healthcare facilities located throughout the New York metropolitan area.

26. Many of Neurological Surgery's patients receive health insurance coverage from Defendants, which are some of the largest health plans serving residents in the New York metropolitan area.

**Defendants**

27. Upon information and belief, Defendant Empire Healthchoice HMO, Inc. is a New York business corporation licensed by the New York to operate a health maintenance

organization under article 44 of the New York Public Health Law. Its principal place of business is located at 9 Pine Street-14th Floor, New York, New York 10005.

28. Upon information and belief, Defendant Empire Healthchoice Assurance, Inc. (formerly known as Empire Blue Cross and Blue Shield and Blue Cross and Blue Shield of Greater New York) is a New York accident and health insurance company licensed under section 1113(a) of the New York Insurance Law. Its principal place of business is located at 9 Pine Street-14th Floor, New York, New York 10005.

29. Upon information and belief, Defendants are subsidiaries of Anthem, Inc., a for profit health insurance provider headquartered in Indianapolis, Indiana.

30. Anthem, Inc. is the largest for-profit managed health care company in the Blue Cross Blue Shield Association. As of December 31, 2020, its medical enrollment totaled approximately 42.9 million members. Anthem is the largest healthcare company in the world by revenue, with 2019 revenue of $242 billion. Its operating income for 2019 was $18 billion. In 2018, it was ranked 29th on the Fortune 500.

31. In 2019, Empire's share of the New York State commercial health plan market was 21.6%. Its share of the New York City metro area commercial market was 26.2%.[2]

**JURISDICTION AND VENUE**

32. Jurisdiction of this Court is proper under 28 U.S.C. § 133, providing for original jurisdiction by federal courts over "a claim or right arising under" the laws of the United States.

---

[2] http://www.markfarrah.com/mfa-briefs/health-insurance-competition-and-commercial-market-share-in-three-new-york-metro-areas/#:~:text=Approximately%2013.3%20million%20people%20were,plan%20in%20New%20York%20MSAs.&text=Total%20commercial%20enrollment%20is%20nearly,11.4%25%20and%208.0%25%20respectively.(accessed Apr. 7, 2021).

33. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the acts complained of have occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

34. Neurological Surgery repeats and re-alleges the matters set forth above as if more fully set forth herein.

**The Neurosurgery Market**

35. Neurosurgery is the medical specialty concerned with the prevention, diagnosis, surgical treatment, and rehabilitation of disorders that affect the body's nervous system, including the brain, spinal cord, central and peripheral nervous system, and cerebrovascular system.

36. The physicians who specialize in providing neurosurgical care are neurosurgeons.

37. In the United States, neurosurgeons typically must complete seven years of post-graduate medical training – residency training – after graduating from medical school.[3]

38. The hallmark of neurosurgical training, experience, and competence in the United States is board certification. The two main board certification bodies for neurosurgery are the American Board of Neurological Surgery and the American Osteopathic Board of Surgery.[4]

39. Conditions treated by neurosurgeons include meningitis and other central nervous system infections, spinal disc herniation, cervical and lumbar spinal stenosis, hydrocephalus, head trauma, tumors of the brain, spinal cord trauma, traumatic injuries of peripheral nerves, tumors of the spine, spinal cord, and peripheral nerves, intracerebral hemorrhages, Parkinson's Disease, and vascular malformations.

---

[3] *See, e.g.*, "The Johns Hopkins Neurosurgery Residency Program," Johns Hopkins Medicine, available at https://www.hopkinsmedicine.org/neurology_neurosurgery/education/residencies/neurosurgery_residency/program_overview/.
[4] AMERICAN BOARD OF NEUROLOGICAL SURGERY, https://abns.org; AMERICAN OSTEOPATHIC BOARD OF SURGERY, https://certification.osteopathic.org/surgery/.

40. Patients with these conditions usually need medical diagnosis and treatment by a trained neurosurgeon; other medical professionals or specialists are not reasonable substitutes because they are not qualified or competent to provide the same level of treatment or care.

41. Given the chronic and urgent nature of many of these neurosurgical conditions, patients need to seek treatment close to where they live and work. Generally, most patients are willing to travel only about 30 minutes for neurosurgery services. Accordingly, the relevant geographic market for neurosurgery services in this lawsuit is no larger than the New York metropolitan area.

**Importance of Freestanding Practices**

42. Traditionally, most neurosurgical care in the United States – and in the New York metropolitan area in particular –has been provided through freestanding physician practices comprised of a single or a relatively small number of neurosurgeons. Neurological Surgery is an example of one such freestanding neurosurgical practice.

43. Providing neurosurgical care through freestanding practices has a number of very significant benefits. The neurosurgeons themselves own these practices, and thus are free to decide all aspects of how to deliver their services to patients. Given the relatively small size of these practices, the neurosurgeons have been able to develop longstanding, personal relationships with patients, which enhance both the quality of patient care and the overall patient experience.

44. Additionally, because these practices have traditionally been independent of any hospital, referring provider, or health plan, they have been able to recommend the best course of medical treatment free of any outside influence. They are also small enough to innovate nimbly.

45. In addition to freestanding neurosurgical practices, hospitals also provide neurosurgical care. These hospitals employ neurosurgeons, who provide care on behalf of the hospital, which is responsible for billing and collecting for the treatment rendered.

46. Since hospital-employed neurosurgeons are employees, the hospitals largely dictate the means and manner of the care that they provide. The hospital determines such issues as patient load, scheduling, managed care reimbursement, and other logistical matters.

47. Through the years, many patients have found freestanding, private neurosurgical practices as the optimal setting for care. This is largely because, given the relatively small size of these practices, the physicians in these practices are able to provide personalized, high quality, innovative care with lower patient volume and shorter wait times.[5] This is in contrast to hospital-based neurosurgical care, which typically relies on a high volume, more impersonal model of care.

48. Studies have shown that "small, physician-owned practices, while providing a greater level of personalization and responsiveness to patient needs, have lower average cost per patient, fewer preventable hospital admissions, and lower readmission rates" than larger or hospital-owned practices.[6]

49. Accordingly, the presence of many robust, high quality freestanding private neurosurgical practices in the New York metropolitan area has enhanced competition, improved quality of care, and provided increased patient choice and innovation.

---

[5] Farzad Mostashari, M.D., *The Paradox of Size: How Small, Independent Practices Can Thrive in Value-Based Care*. ANNALS OF FAMILY MEDICINE, January 2016, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4709149/.

[6] *See* Mostashari, *supra* note 3; *see also* Richard Menger, et al., *Commentary: Impact of Hospital and Health System Mergers and Acquisitions on the Practicing Neurosurgeon: Survey and Analysis from the Council of State Neurosurgical Societies Medical Director's Ad Hoc Representative Section*, NEUROSURGERY, Vol. 82, Issue 6, June 2018, pp. 157–63, https://academic.oup.com/neurosurgery/article/82/6/157/4935567 (discussing how hospital consolidation often increases medical costs for patients).

**Importance of Reimbursement Rates**

50. Unfortunately, as Empire is well aware, the Achilles heel of freestanding, private neurosurgical practices is managed care reimbursement. Neurosurgical care, by its very definition, is labor intensive, requires substantial expertise, and is high risk. Thus, the costs of providing that care is very high – particularly in the New York metropolitan area – and correspondingly high levels of managed care reimbursement is absolutely essential for these practices to survive. Empire is entirely aware of this fact.

51. In addition, the nature of freestanding, private neurosurgical practices make them far more sensitive to managed care reimbursement levels than hospital-employed neurosurgical care.

52. This is because, as Empire is well aware, hospitals are able to rely on other sources of related managed care reimbursement than simply the reimbursement for professional neurosurgical care.

53. Hospitals, for example, receive a facility fee when neurosurgical procedures are performed in their operating and procedure rooms. This is in addition to the reimbursement they receive for providing professional neurosurgical care. These facility fees are high, usually far exceeding the charges for actual medical services.[7]

54. In addition, hospitals receive reimbursement for other ancillary medical care provided in connection with neurosurgical care, such as radiological services, anesthesia, and rehabilitation. Thus, hospitals are not very dependent on the reimbursement for professional neurosurgical care, as freestanding private groups are. In 2016, for every $1 of neurosurgery-

---

[7] Sandra G. Boodman, *Extra Health-Care Facility Fees Take Many Patients by Surprise*, WASH. POST, Oct. 6, 2009, https://www.washingtonpost.com/wp-dyn/content/article/2009/10/05/AR2009100502910.html.

11

specific reimbursement a hospital-based neurosurgeon generates, the hospital generates $14 in other, related revenues.[8]

**Empire's Market Power**

55. Like all healthcare, neurological surgery practices are dependent on reimbursement from third-party healthcare payers to pay for the medically necessary and highly complex services that they render to patients. Few patients have the economic means to pay for high quality and complex neurosurgery services out of their own pockets.

56. The three major classifications for health care payers in the United States are (a) commercial health insurance plans; (b) the Medicare program (which predominantly covers those over 65 years old or disabled); and (c) the Medicaid (which covers persons who are economically disadvantaged.

57. In 2019, 55.6% of New York state residents were members of commercial health insurance plans. As alleged above, in 2019, Empire's share of the New York State commercial health plan market was 21.6%. Its share of the New York City metro area commercial market was 26.2%.[9]

58. Empire has a significant and ever-growing share of the Medicare Advantage market in New York. It also has a significant share of the Medicaid market through its community health care plans.

---

[8] Bonnie Davis, *Neurosurgery Reimbursement Shifts "Trickle Down" to Compensation Structures*, NEUROSURGERY MARKET WATCH, http://harlequinna.com/hr/wp-content/uploads/2016/05/16-HR-Newsletter-v6-i1-LR.pdf.
[9] http://www.markfarrah.com/mfa-briefs/health-insurance-competition-and-commercial-market-share-in-three-new-york-metro-areas/#:~:text=Approximately%2013.3%20million%20people%20were,plan%20in%20New%20York%20MSAs.&text=Total%20commercial%20enrollment%20is%20nearly,11.4%25%20and%208.0%25%20respectively.(accessed Apr. 7, 2021).

12

**Empire's Ability to Dictate Reimbursement Rates**

59. Generally, there are two types of relationships between a commercial health insurance plan such as Empire and private, freestanding medical practices such as Neurological Surgery. The first type of relationship is an "in-network" or "participating provider" relationship. The second type of relationship is an "out-of-network" or "non-participating provider" relationship.

60. In an in-network relationship, the health plan accepts the practice's clinicians as credentialed participating providers, and the parties enter into a participating provider agreement.

61. The parties' participating provider agreement in an in-network relationship governs the amount that the health plan will reimburse the provider for covered services, how claims are submitted, how claims are paid, how disputes are resolved, and such issues as prior approval and pre-certification.

62. The advantages that a medical practice derives from an in-network relationship are (a) being listed in the health plans' material as a participating provider; (b) receiving reimbursement directly from the carrier; and (c) avoiding significant out-of-pocket costs for its patients.

63. Empire has significant power and control over medical practices in an in-network relationship. First, Empire decides, in essentially unfettered discretion, what practices to permit to join its networks and what practices to turn down.

64. Then, even when it accepts a practice and begins "negotiating" a participating provider agreement with that practice, Empire typically holds all the cards and dictates the terms of the agreement on a take it or leave it basis.

65. Virtually no freestanding medical practice has the ability to negotiate reimbursement rates or other terms of a participating provider agreement offered by Empire, given its market power in New York.

66. The other relationship that Empire has with medical practices is an out-of-network relationship. In that type of relationship, there is no contractual agreement between Empire and the practice. Instead, whether, and to what extent, an out-of-network provider is reimbursed for services that out-of-network providers render to Empire's members and beneficiaries is dictated by the terms of Empire's plan documents. Out-of-network providers have no say or control in the terms of these plan documents.

**Empire's Dramatic Reduction of Neurosurgery Reimbursement Rates**

67. Over the last few years, Empire has dramatically reduced its reimbursement rates for neurosurgery services in the New York metropolitan area.

68. Empire has accomplished this in several ways. First, for its in-network providers, Empire has demanded extraordinarily low reimbursement rates for neurosurgery services on a take-it-or-leave-it basis when negotiating participating provider agreements. It also has refused to increase existing contractual in-network reimbursement rates notwithstanding significant increases in expenses.

69. With regard to out-of-network providers, Empire has over the last several years, consistently reduced or limited the "allowable amounts" that can be paid to out-of-network providers for medically necessary neurosurgical services provided to their beneficiaries.

70. Because of this, the reimbursement levels offered in the New York metropolitan area by the Empire for many complex neurosurgical procedures are now far below the costs

14

incurred by Neurological Surgery and other freestanding, private neurosurgical services for performing those procedures.

71. While these decreased reimbursement levels apply across-the-board for all professional neurosurgical services, the decreased reimbursement levels have had a disparately negative impact on freestanding, private groups such as Neurological Surgery.

72. This is because, as Empire is well aware, hospitals have other sources of reimbursement for neurosurgical care besides the reimbursement for the professional services.

73. Specifically, for every $1 in direct reimbursement that hospitals receive from providing neurosurgery services, the hospitals receive $14 in additional ancillary revenue generated from those neurosurgery services. Thus, the hospitals can accept an artificial lowering of this $1 in direct neurosurgery reimbursement to 10¢, if the $14 in ancillary reimbursement is preserved. Thus, the hospital-based groups are largely immune from the dramatically lowered, fake, and manipulated lowered reimbursement rates.

74. Moreover, the hospitals can use this $14 to help defray the high costs of providing neurosurgery services, while the freestanding practices such as Neurological Surgery are forced to pay these ever-increasing costs out of the 10¢ of direct reimbursement.

75. As a result, Neurological Surgery and other freestanding practices are falling further and further behind financially because of the dramatically declining reimbursement rates, which no longer even remotely reflect the high costs of providing neurosurgery care. Put simply, the direct neurosurgery reimbursement rates that Empire is forcing Neurological Surgery and other freestanding groups to accept are artificial and in no way reflective of reality.

76. As Empire is well aware, the freestanding, private groups do not have these alternative sources of reimbursement and thus bear the brunt of the decreased, below-cost reimbursement.

**Effects of Empire's Actions**

77. Because the freestanding, private practices are persistently receiving these fake and manipulated reimbursements from Empire, many of these practices have been forced out of business or forced to sell their practices to hospitals or multispecialty groups. This is Empire's intent.

78. For instance, from 2004 to 2011 hospital ownership of physician practices more than doubled – from 24% of practices to 49%.[10]

79. Accordingly, many freestanding private neurosurgical practices have completely left the market or been significantly hampered in their ability to compete. In a 2018 survey of 358 neurosurgeons, 92% noted consolidation in their healthcare market and 46.35% stated that they had "lost control of their practice."[11] All, including Neurological Surgery, have lost substantial sums of money.

80. This has not only harmed Neurological Surgery and the other freestanding, private neurosurgical groups; it has significantly harmed competition in general in the relevant market by consumers in the market. Empire is well aware of this fact.

81. This has resulted in decreased output and quality of neurosurgery and other surgical services, higher prices, longer wait times, and loss of consumer choice.

82. With the loss of many freestanding, private neurosurgery practices, patients have been forced to crowd into and receive care from high-volume hospital-based neurosurgery

---

[10] David M. Cutler and Fiona Scott Morton, *Hospitals, Market Share, and Consolidation*, JAMA, Nov. 13, 2013, https://pubmed.ncbi.nlm.nih.gov/24219952/.
[11] *See* Menger, *supra* note 4.

16

groups, which have far longer wait times, spend less time with patients, and provide care that is far more impersonal. This has significantly affected consumer welfare.

**Empire's Anti-Competitive Motivations**

83. As discussed above, nothing more than pure greed motivates Empire's actions.

84. Empire is well aware that forcing freestanding surgical practices out of business eliminates a major thorn in its side. These freestanding surgical practices fiercely advocate for their patients and expose the fact that many of Empire's health plans offer illusory benefits and minimal coverage in many cases.

85. By educating patients in these way, patients put pressure on the health plans to innovate, improve their offerings, and change their ways. This significantly promotes competition among health plans in the market for purchasing health plan benefits.

86. Elimination of freestanding surgical practice will grind this competition to a halt, and thus greatly harm the individual and corporate purchasers of health plan benefits. Accordingly, by eliminating these practices, the health plans collectively eliminate these sources of competition and preserve the status quo.

87. Because of all of the foregoing, Defendants' actions have greatly and irreparably harmed competition in general and Neurological Surgery in particular.

## FIRST CAUSE OF ACTION

88. Neurological Surgery repeats and re-alleges each of the above paragraphs as though fully set forth herein.

89. Empire possesses and exercises market power in the relevant product and geographic markets identified in this Complaint.

17

90. At all times relevant to this Complaint, Empire, together with its co-conspirators, has entered into contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

91. These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by Neurological Surgery and other independent providers of neurological surgery services, ultimately leading to lower quality neurological surgery services available to patients.

92. These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

93. Because of the foregoing, Neurological Surgery has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

94. Neurological Surgery repeats and re-alleges each of the above paragraphs as though fully set forth herein.

95. Empire possesses and exercises market power in the relevant product and geographic markets identified in this Complaint.

96. At all times relevant to this Complaint, Empire, together with its co-conspirators, has entered into contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of the Donnelly Act, General Business Law §§ 340, *et seq*.

97. These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by Neurological Surgery and

other independent providers of neurological surgery services, ultimately leading to lower quality neurological surgery services available to patients.

98. These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

99. Because of the foregoing, Neurological Surgery has been damaged in an amount to be determined at trial.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiff, Neurological Surgery Practice of Long Island, PLLC, respectfully requests the following relief:

(a) on the first cause of action, a declaration that Empire's conduct constitutes violations of Sections One of the Sherman Act, 15 U.S.C. § 1;

(b) on the first cause of action, a permanent injunction preventing Empire and their agents and employees from continuing their unlawful actions set forth herein;

(c) on the first cause of action, an award of damages, in an amount to be determined at trial, to be trebled according to law, to compensate Neurological Surgery for the damages it incurred from Empire's violations of law;

(d) on the first cause of action, an award of prejudgment interest;

(e) on the first cause of action, an award of reasonable attorneys' fees and the costs of suit incurred;

(f) on the second cause of action, damages in an amount to be determined at trial; and

(g)     such other and further relief this Court deems just and proper including the costs, disbursements, attorney's fees, and other allowances of this action.

Dated: Uniondale, New York
April 21, 2021

                                  HARRIS BEACH, PLLC.
                                  *Attorneys for Plaintiff*

                                  By   /s/ Roy W. Breitenbach
                                         Roy W. Breitenbach

                                  The Omni
                                  333 Earle Ovington Boulevard
                                  Uniondale, New York 11553
                                  (516) 880-8378

TO:    EMPIRE HEALTHCHOICE HMO, INC.
        9 Pine Street-14th Floor
        New York, New York 10005

        EMPIRE HEALTHCHOICE ASSURANCE, INC.
        9 Pine Street-14th Floor
        New York, New York 10005