UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
NEUROLOGICAL SURGERY PRACTICE OF LONG ISLAND, PLLC,

Plaintiff,

v.

EMPIRE HEALTHCHOICE HMO, INC. and EMPIRE HEALTHCHOICE ASSURANCE, INC.,

Defendants.
-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CV-2204 (RPK) (AYS)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Neurological Surgery Practice of Long Island, PLLC brings this action alleging violations of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, New York General Business Law §§ 340, *et seq*. Plaintiff alleges that defendants Empire Healthchoice HMO, Inc. and Empire Healthchoice Assurance, Inc. unreasonably restrained trade, in violation of those statutes, by entering into agreements with certain New York hospitals that provide for the hospitals to be reimbursed for neurological services at rates that are below the cost of providing those services. Defendants have moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendants' motion is granted.

**BACKGROUND**

The following facts are taken from the complaint and are assumed true for the purposes of this order.

Plaintiff Neurological Surgery is a freestanding medical practice "providing high quality neurosurgery care to patients throughout the New York metropolitan area." Am. Compl. ¶ 5 (Dkt.

#22). "Neurosurgery services focus on the prevention, diagnosis, surgical treatment, and rehabilitation of disorders that affect" the "brain, spinal court, central and peripheral nervous system, and cerebrovascular system." *Id.* ¶¶ 35, 108. These services are provided by neurosurgeons in dedicated neurosurgical practices like plaintiff's, multispecialty groups offering neurosurgical care, and hospitals. *Id.* ¶¶ 40, 43–45, 101, 113, 121. Because the needs for which patients seek neurological care are generally "chronic and urgent," patients typically "seek treatment close to where they live and work," making "the relevant geographic market for neurosurgery services in this lawsuit . . . no larger than the New York metropolitan area." *Id.* ¶ 41.

Defendants Empire Healthchoice HMO and Empire Healthchoice Assurance are affiliated entities that provide private health insurance in New York. *Id.* ¶¶ 27–31. As of 2019, defendants served 26.2% of the private health insurance market in the New York metropolitan area. *Id.* ¶¶ 31, 118.

When a member of a private insurance plan like defendants' receives services from a medical-care provider, the insurer may reimburse the provider an amount that may depend on whether the provider is "in network" or "out of network." *Id.* ¶ 59. When a medical-care provider is "in network," the insurer and provider have an agreement about how much the provider will be reimbursed. *Id.* ¶¶ 60–61. When a medical-care provider is "out of network," "there is no contractual agreement between [the insurer] and the practice," but the insurer's agreement with its members may still provide for payments to the medical-care provider. *Id.* ¶ 66. Defendants have both in-network and out-of-network relationships with medical-care providers. *Id.* ¶¶ 59–66.

In the complaint, plaintiff alleges that defendants use provider agreements with in-network hospitals to "exclude freestanding neurosurgery practices," like plaintiff, "from the New York metropolitan area neurosurgery market." *Id.* ¶ 67. Plaintiff's allegations focus on the amount that

defendants agree to reimburse in-network providers for neurosurgical services. *Id.* ¶¶ 79, 81. Plaintiff alleges defendants demand "extraordinarily low reimbursement rates" for neurosurgical services—below the cost of providing these services—"on a take-it-or-leave-it basis when negotiating participating provider agreements" with in-network hospitals. *Id.* ¶¶ 80, 88. Because defendants negotiate these agreements on a "hospital-wide basis covering all services that the hospital or health system provides," *id.* ¶ 85, the in-network hospitals are willing to agree to these low reimbursement rates because the insurer is simultaneously agreeing to reimbursement rates for services ancillary to neurosurgical care that "defray the high costs of providing neurosurgery services," *id.* ¶ 93; *see id.* ¶¶ 85–86, 91–92.

Plaintiff asserts that the in-network hospitals' "agreements to these dramatically low reimbursement rates for neurosurgical services has enabled [defendants] to dictate these same rates to freestanding neurosurgery practices." *Id.* ¶ 96. But these private neurosurgery practices receive only the "below cost" service-specific reimbursement rate when providing neurosurgical services; they do not receive ancillary revenue because private neurosurgery practices provide only the primary neurosurgical service. *Id.* ¶¶ 88, 95, 98. Plaintiff alleges that defendants are aware "these dramatically low reimbursement rates can be, and have been, catastrophic for [their] survival, [while] hospital-based neurosurgery providers have an ability to weather the storm" due to this ancillary revenue. *Id.* ¶¶ 90–91.

According to plaintiff, this scheme "has caused a significant number of freestanding, private neurosurgery practices to leave the relevant market by either going out of business entirely or being forced to sell their practices to hospitals or multispecialty groups, [and] . . . [t]hose that have survived have been seriously hampered in their ability to compete." *Id.* ¶ 121. Plaintiff asserts that "[t]his is empirically demonstrated on Long Island by the departure of at least three

large-scale freestanding neurosurgical groups in the last several years." *Id.* ¶ 105. Plaintiff further asserts that this loss of private neurosurgery practices has led to "decreased output and quality of neurosurgery and other surgical services, higher prices, longer wait times, and loss of consumer choice." *Id.* ¶ 122. In turn, plaintiff alleges, patients must "crowd into and receive care from high-volume hospital-based neurosurgery groups" that plaintiff asserts typically "have far longer wait times, spend less time with patients, and provide care that is far more impersonal." *Id.* ¶ 123. Plaintiff further alleges that the lowering of reimbursement rates has a "direct negative economic effect" on "patients with high deductible plans or plans with large cost-sharing requirements for out-of-network services," because those patients "have had to pay significantly more out-of-pocket to receive medically necessary services." *Id.* ¶ 124.

Plaintiff's amended complaint challenges defendants' practices under Section 1 of the Sherman Act, 15 U.S.C. 1, and under New York's parallel Donnelly Act, General Business Law 340, *et seq*. Defendants have moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) directs a court to dismiss a complaint that "fail[s] to state a claim upon which relief can be granted." To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The facial "plausibility standard is not akin to a probability requirement," but it requires a plaintiff to allege sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)) (quotation marks omitted). In contrast, a complaint fails to state a plausible claim when, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or when,

as a matter of fact, "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

## DISCUSSION

Defendants' motion to dismiss is granted because plaintiff does not plausibly allege that defendants entered agreements that unreasonably restrain trade.

### I. Plaintiff Fails to Plausibly Allege a Sherman Act Violation.

The complaint does not plausibly allege a violation of Section 1 of the Sherman Act. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To plead a Section 1 violation, plaintiff must plausibly allege that "(1) a contract, combination, or conspiracy exists that (2) unreasonably restrains trade." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021). "Such a contract, combination, or conspiracy may be either horizontal or vertical in nature." *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 588 (E.D.N.Y. 2020). "A horizontal agreement is between competitors at the same level of the market . . . while a vertical agreement is between actors at different levels of the market." *Ibid*. (citing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 243 (2d Cir. 1997)).

Plaintiff alleges vertical agreements between defendants and each in-network hospital providing neurosurgical care "under which [defendants] paid, and the hospital accepted, artificially lower and manipulated reimbursement rates for neurosurgical services." Pl.'s Mem. in Opp'n 14 ("Pl.'s Mem.") (Dkt. #34); *see* Compl. ¶¶ 86–94 (alleging agreements between defendants and in-network hospitals in which in-network hospitals agree to below-cost reimbursement rates for neurosurgical services). Assuming *arguendo* that plaintiff had adequately pleaded those

agreements, plaintiff has not plausibly alleged the second element—an unreasonable restraint of trade.

Vertical restraints of trade are assessed for reasonableness under the "rule of reason." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*") (citation omitted), which is the mode of analysis that plaintiff invokes, *see* Pl.'s Mem. 17. To apply the rule of reason, a plaintiff must first identify the relevant market, meaning "the area of effective competition." *Amex*, 585 U.S. at 543 (citation omitted). Here, plaintiff alleges—and defendants accept for purposes of their motion to dismiss—that the relevant market is medically necessary neurological services for patients with private insurance in the New York City metropolitan area. *See* Am. Compl. ¶¶ 35–41, 108–115; Pl.'s Mem. 18–19; Defs.' Mem. in Supp. 8 n.3 (Dkt. #32) (defendants' acceptance of plaintiff's market definition for purposes of the motion-to-dismiss stage). In the relevant market, according to plaintiff, private neurosurgical practices, multispecialty practices, and hospitals are sellers of services, Am. Compl. ¶¶ 40, 43–45, 101, 113, 121, while patients are the market consumers, *id.* ¶ 114. Defendants and other "managed care plans[] who have [patient-]members located within the relevant geographic market" are purchasers of neurosurgical services. *Id.* ¶ 115.

Once the relevant market is identified, the rule of reason is used to assess whether a restraint is one "with anticompetitive effect[s] that are harmful to the consumer," through a "fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Amex*, 585 U.S. at 541 (quotation marks, brackets, ellipses, and alteration omitted). To adequately plead a Sherman Act violation under this framework, the plaintiff must plausibly allege "a substantial anticompetitive effect that harms consumers in the relevant market." *Ibid.* (describing plaintiff's initial burden); *see, e.g.*, *Giordano v. Saks & Co. LLC*, No. 23-600-CV, 2025 WL 799270, at *3 (2d Cir. Mar. 13, 2025) (affirming dismissal when plaintiff failed to put

forward plausible evidence to satisfy initial burden); *Amigo Shuttle Inc. v. Port Auth. of New York & New Jersey*, No. 25-83, 2025 WL 2618862, at *3 (2d Cir. Sept. 11, 2025) (same); Pl. Br. 17 (noting this requirement).

A plaintiff can satisfy its burden with respect to anticompetitive effects through direct or indirect evidence. *Amex*, 585 U.S. at 542. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ibid.* (brackets, ellipses, quotation marks, and citation removed). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Ibid*. "Because the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).

As explained below, plaintiff has not plausibly alleged anticompetitive effects that are harmful to the consumer through either direct or indirect evidence with respect to the market it alleges.

**A. Direct Evidence of Actual Anticompetitive Effect**

Plaintiff has not met its initial burden of plausibly alleging through direct evidence—such as evidence of "reduced output, increased prices, or decreased quality in the relevant market"—that the agreements plaintiff challenges have had "a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 585 U.S. at 541–42. Plaintiff's principal argument for direct effects has two parts. At the first step, plaintiff principally asserts that defendants' agreements on reimbursement rates with in-network hospitals have caused "freestanding" neurosurgical practices to be "forced out of business or forced to sell their practices to hospitals or multispecialty groups." Am. Compl. ¶ 101. Then, plaintiff alleges that market-wide reduced

output and decreased quality have resulted because "patients have been forced to crowd into and receive care from high-volume hospital-based neurosurgery groups, which have far longer wait times, spend less time with patients, and provide care that is far more impersonal." Pl.'s Mem. 20–21; *see* Am. Compl. ¶¶ 103–05.

Plaintiff's claim of reduced output is flawed at both steps. At the first step plaintiff has pleaded at best a *mechanism* through which defendants' in-network agreements on prices could lead to a reduction in the number of freestanding neurosurgical practices contingent on defendants having sufficient market power—but not *evidence* that defendants' in-network agreements have led to this result. As evidence, plaintiff cites statistics that show general consolidation in the medical field over decades, with fewer physicians working in private practices (including but not limited to fewer neurosurgeons) and more physicians working in hospitals. *See* Am. Compl. ¶¶ 102–05. This evidence of consolidation in the field over decades does not plausibly suggest that *defendants' price agreements with in-network hospitals* have caused consolidation, leading to fewer freestanding neurosurgical practices. Plaintiff's most specific allegation regarding practice consolidation is a claim that "at least three large-scale freestanding neurosurgical groups" have "depart[ed]" Long Island "in the last several years." *Id.* ¶ 105. But plaintiff does not present evidence to plausibly link these closures to defendants' reimbursement rates, as opposed to the broader trend of consolidation or other factors. Indeed, plaintiff does not present any historical benchmark that would suggest the closure of three practice groups in several years is atypical.

Plaintiff's claim of reduced output is flawed at the second step as well, because plaintiff fails to plead facts supporting an inference that reducing the number of freestanding practices would reduce output. Neurosurgical services are provided by neurosurgeons, who can work in private practices, multispecialty groups, or hospitals. *Id.* ¶¶ 25, 42. Accordingly, to plead a

reduction in output, the complaint must allege a reduction in the number of neurosurgeons or neurological procedures, not just a reduction in the number of freestanding practices. The amended complaint does not do so. *See id.* ¶¶ 103–05 (describing trend of consolidation in hospital-linked practices); *id.* ¶ 121 (asserting that the lowering of neurosurgery reimbursement rates "has caused a significant number of freestanding, private neurosurgery practices to leave the relevant market by either going out of business entirely *or being forced to sell their practices to hospitals or multispecialty groups*") (emphasis added).

Plaintiff has also failed to offer evidence—as opposed to conclusory assertions—regarding reduced quality of care. As with plaintiff's claims of reduced output, plaintiff's claims regarding quality of care depend on its antecedent assertion that defendants' agreements with hospitals have reduced the number of freestanding neurosurgery practices. As explained above, plaintiff has not pleaded facts that constitute evidence of this. And even assuming that plaintiff had plausibly alleged that reduction, plaintiff's complaint is bereft of allegations that—taken as true—would constitute evidence regarding a reduced quality of services from that shift. Plaintiff attempts to make this link through generalizations about the quality of care in different practice types, asserting that private neurosurgical practices "provide personalized, high quality, innovative care with lower patient volume and shorter wait times . . . in contrast to hospital-based neurosurgical care, which typically relies on a high volume, more impersonal model of care," *id.* ¶ 47, "which ha[s] far longer wait times [and] spend[s] less time with patients," *id.* ¶ 123. Bracketing the question of whether volume and wait times are the proper metrics for quality, as opposed to metrics such as procedure efficacy or efficiency, plaintiff's allegations are simply generalizations about how freestanding practices and hospitals "typically" operate. *Id.* ¶ 47. Even assuming defendants' in-network reimbursement contracts led to the closure of some private neurosurgical groups, with care shifting

to other practice types, plausibly alleging a decline in quality from these shifts would require some evidence that *the practices that closed* provided superior care to the practices that assumed their patient load. Plaintiff's broad-strokes characterizations of "typical" hospital and small-group care does not form this bridge. Given these deficiencies, the amended complaint does not adequately plead direct evidence of harm to care quality.

As to price, while the amended complaint conclusorily asserts that defendants' agreements with hospitals result in "higher prices," *e.g. id.* ¶ 8, it is bereft of plausible allegations to support the counterintuitive claim that defendants' agreements with hospitals to pay *lower* rates for neurological services on behalf of members generated *higher* prices in the relevant market for these services. Plaintiff's narrower claim that defendants' agreements result in higher out-of-pocket costs to the subset of consumers with "high deductible plans" or "plans with large cost-sharing requirements for out-of-network services," *id.* ¶ 124; *see* Pl.'s Mem. 21, is similar *ipse dixit*. Of course, health plan members with higher deductibles must pay a higher amount for medical care before their insurer pays a portion than members who have lower deductibles. And patients with higher "cost-sharing requirements for out-of-network services" must pay a higher portion of an out-of-network bill than a patient with lower cost-sharing requirements would have to pay. But the amended complaint does not contain facts that would support an inference that defendants' agreements with hospitals to pay lower in-network rates for neurosurgical services would raise prices (or even out-of-pocket costs) for these high-deductible or high-cost-sharing plan members.

In sum, plaintiff has not plausibly alleged "a substantial anticompetitive effect that harms consumers in the relevant market" through direct evidence such as evidence of "reduced output, increased prices, or decreased quality." *Amex*, 585 U.S. at 541–42.

**B. Indirect Evidence of Actual Anticompetitive Effect**

Plaintiff's attempts to plead anticompetitive effects through indirect evidence fail because plaintiff has not plausibly alleged that defendants have market power.

Absent direct evidence of anticompetitive effects, a plaintiff can carry its initial burden of showing anticompetitive effects through indirect evidence, meaning "proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542; *see Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). "Market power is the ability to raise price profitably by restricting output." *Amex*, 585 U.S. at 549 (citation and emphasis omitted). "[W]here plaintiffs use market share as a proxy for market power, '[c]ourts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.'" *Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826, 2018 WL 8967057, at *3 (E.D.N.Y. Aug. 7, 2018) (alteration in original) (quoting *Com. Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003)).

Plaintiff fails to plead anticompetitive effects through indirect evidence under these benchmarks. Plaintiff's allegations of market power are based on market share. *See* Am. Compl. ¶¶ 55–58; Pl.'s Mem. 22. But plaintiff alleges that defendants have only 26.2% of the market for private medical insurance in New York City, and 26.2% is not a share that raises an inference of market power. *See, e.g.*, *Abbott Lab'ys*, 2018 WL 8967057 at *3; *Michael E. Jones, MD., P.C. v. Aetna, Inc.*, No. 19-CV-9683 (JPO), 2020 WL 5659467, at *2–3 (S.D.N.Y. Sept. 23, 2020) (finding that Aetna's 33% market share "does not in fact control a dominant share of the market"); *Com. Data Servers*, 262 F. Supp. 2d at 74–75 (collecting cases that hold that market share below 30% cannot demonstrate market power). Indeed, plaintiff has not offered a single case that treats this market share as sufficient to raise an inference of market power, and it has not distinguished or addressed the cases that hold comparable market shares do not. Accordingly, the amended

complaint does not plausibly allege market power as required to make a plausible showing of anticompetitive effects based on indirect evidence.

Plaintiff fails to sufficiently allege, directly or indirectly, that defendants' conduct resulted in actual adverse effects as necessary to state a Section 1 rule-of-reason violation. Its Section 1 claim is dismissed.

## II. Plaintiff fails to state a claim under the Donnelly Act.

For the reasons plaintiff's claim under Section 1 of the Sherman Act is dismissed, its Donnelly Act claim must also be dismissed. The Donnelly Act is generally coextensive with the Sherman Act, *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 81 (2d Cir. 2013), and plaintiff concedes that its Donnelly Act claim should be treated the same as its Sherman Act claim, Pl.'s Mem. 24.

## CONCLUSION

Plaintiff's claims are dismissed without prejudice. Plaintiff may file a motion seeking leave to file an amended complaint within thirty days. Any such motion should include the proposed amended complaint as an exhibit and explain why leave to amend should be granted. If plaintiff does not seek leave to amend within thirty days, judgment shall be entered.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: August 14, 2026
Brooklyn, New York